UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEANDRE LAMONT HAMILTON,

*Plaintiff*,

v.

UNITED STATES OF AMERICA *et al.*,

*Defendants.*

Civil Action No. 19-1105 (RDM)

**MEMORANDUM OPINION AND ORDER**

This case tragically illustrates the old legal maxim that a misstep, like a rock thrown into a pond, can cause "ripples to spread" such that the "history of that pond is altered to all eternity." *Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 103 (1928) (Andrews, J., dissenting).  In 2016, the Superior Court of the District of Columbia granted pretrial release to Wayne Wright, on the condition that he stay away from a certain block in Southeast D.C.  To ensure Wright's compliance, the court ordered that the Court Services and Offender Supervision Agency ("CSOSA") attach a tracking device to his leg.  The CSOSA contractor assigned this task mistakenly fixed the device to Wright's prosthetic leg.  Wright then switched out the tracked prosthesis for another one, left his home, traveled to the block that he was forbidden to visit, and murdered Dana Hamilton.

DeAndre Hamilton, as the personal representative of Dana Hamilton's estate, brings this lawsuit against the United States of America, CSOSA, Sentinel Offender Services, LLC, and John Does 1–5 for negligently installing the tracking device and thereby causing Dana Hamilton's death.  The United States and CSOSA (collectively, "federal Defendants") move to dismiss on multiple grounds.  Because the Federal Tort Claims Act ("FTCA") does not waive

1

sovereign immunity for suits against federal agencies, the Court will dismiss all claims against CSOSA.  And because the FTCA does not waive sovereign immunity for suits against the United States premised on the negligence of independent contractors, the Court will dismiss Plaintiff's claims against the United States.  Plaintiff may, however, file a motion seeking leave to amend his complaint, as discussed below, within twenty-one days of this decision.

## I. BACKGROUND

### A.   Factual and Procedural Background

The tragic series of events that led to this lawsuit began on April 30, 2016, when Wayne Wright, also known as Quincy Green, was charged in the Superior Court with unlawful possession of a firearm.  Dkt. 1 at 4 (Compl. ¶ 15).  A few days later, the Superior Court released Wright pending trial—with certain conditions.  *Id.* (Compl. ¶ 16).  The court ordered that a global positioning system monitoring device ("GPS") be affixed to Wright's leg, so that CSOSA could track his location.  *Id*.  The Court further ordered that Wright stay away from the 800 block of Chesapeake Street S.E. in the District of Columbia ("Stay Away Order").[1]  *Id*.

CSOSA had contracted with Sentinel to manage electronic monitoring services for defendants who are subject to pretrial release, probation, or parole.  *Id.* (Compl. ¶ 17).  As such, it was Sentinel's job to attach the GPS monitor to Wright.  *Id*. at 4–5 (Compl. ¶ 18).  Wright has one detachable prosthetic leg and one natural leg.  *Id.* at 5 (Compl. ¶ 19).  Sentinel's agents (named in the complaint as John Does 1–5) put the GPS on Wright's detachable prosthetic leg.  *Id.* at 5 (Compl. ¶ 20).  Early in the morning of May 19, 2016, Wright switched out the GPS-

---

[1] The complaint refers to Chesapeake Street N.E., Dkt. 1 at 4 (Compl. ¶ 16), as does the Stay Away Order itself, Dkt. 14-1 at 4 (Ex. A).  In their reply brief, the federal Defendants correct the record by explaining that the block in question was actually on Chesapeake Street S.E.  Dkt. 17 at 1.  Based on the Court's review of local maps, it appears that the northeast quadrant of D.C. is the only one *without* a Chesapeake Street.

tracked prosthetic leg for a spare prosthesis and left home undetected. *Id.* (Compl. ¶¶ 21–22). At about 2:40 a.m., he then traveled to the 800 block of Chesapeake Street S.E. in violation of the Stay Away Order and killed Dana Hamilton. *Id.* (Compl. ¶ 22). Within a week, Wright was charged with second-degree murder. *Id.*

On April 18, 2019, Plaintiff filed this lawsuit against the United States, CSOSA, Sentinel, and John Does 1–5. Dkt. 1. The complaint includes five counts, which are confusingly numbered I, II, III, VI, and VII. In Count I, Plaintiff alleges that all Defendants were negligent for failing to attach the GPS monitor properly, failing to monitor Wright's whereabouts effectively, and failing to train their employees properly. Dkt. 1 at 6–7 (Compl. ¶¶ 26–30). In Count II, Plaintiff contends that the United States, CSOSA, and Sentinel are liable for the acts of John Does 1–5 under the doctrine of respondeat superior. *Id.* at 7–9 (Compl. ¶¶ 31–37). In Count III, Plaintiff alleges that the United States, CSOSA, and Sentinel were negligent in their hiring, training, and retention of employees. *Id.* at 9–10 (Compl. ¶¶ 38–46). In Counts VI and VII, Plaintiff asserts separate causes of action against all Defendants for wrongful death and survival. Dkt. 1 at 10–12 (Compl. ¶¶ 47–51).

On October 21, 2019, the federal Defendants moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) and failure to state a claim upon which relief can be granted under Rule 12(b)(6), Dkt. 11, and on November 18, 2019, filed a corrected version of their motion, Dkt. 13-1. On that same day, Plaintiff filed his opposition to the motion. Dkt. 14. On December 20, 2019, the federal Defendants filed their reply brief. Dkt. 17. On January 8, 2020, Plaintiff moved to strike certain arguments in the federal Defendant's reply or, in the alternative, to file a sur-reply brief. Dkt. 18. The Court denied the motion to strike but granted the motion to

3

file a sur-reply. *See* Minute Order (Jan. 21, 2020). On February 3, 2020, Plaintiff then filed his sur-reply brief. Dkt. 22. The motion to dismiss is now fully briefed and ripe for decision.

**B.     Statutory Background**

Under the doctrine of sovereign immunity, the United States may not be sued without its consent. *United States v. Mitchell*, 445 U.S. 535, 538 (1980). "A waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Id.* (quoting *United States v. King*, 395 U.S. 1, 4 (1969)). The government's consent to be sued "must be 'construed strictly in favor of the sovereign,'" *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685 (1983) (quoting *McMahon v. United States*, 342 U.S. 25, 27 (1951)), and must not be "'enlarge[d] . . . beyond what the language requires,'" *id.* at 685–86 (quoting *E. Transp. Co. v. United States*, 272 U.S. 675, 686 (1927)).

The FTCA, upon which Plaintiff premises his claims against the federal Defendants, provides a limited waiver of federal sovereign immunity. It permits individuals to file suit in federal district court against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). The FTCA allows suits to proceed "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id*.

But the FTCA's waiver of sovereign immunity is subject to several exceptions, at least three of which may be relevant here. First, the FTCA does not permit lawsuits against federal agencies. *See* 28 U.S.C. § 2679(a) ("The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims

4

which are cognizable under" the FTCA.). Second, the FTCA excludes from its coverage "any contractor with the United States." *Id.* § 2671. Finally, the FTCA does not waive sovereign immunity for intentional torts, including "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." *Id.* § 2680(h). "[A]bsent full compliance with the conditions the Government has placed upon its waiver, courts lack jurisdiction to entertain tort claims against it." *GAF Corp. v. United States*, 818 F.2d 901, 904 (D.C. Cir. 1987).

## II.  LEGAL STANDARD

When confronted with both a motion to dismiss under both Rule 12(b)(1) and Rule 12(b)(6), the Court must first consider whether it has subject-matter jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). Federal courts are courts of limited subject-matter jurisdiction and "possess only that power authorized by the Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The plaintiff bears the burden of establishing jurisdiction, *Kokkonen*, 511 U.S. at 377, and "subject matter jurisdiction may not be waived," *NetworkIP, LLC v. F.C.C.*, 548 F.3d 116, 120 (D.C. Cir. 2008) (internal quotation marks and citations omitted).

A Rule 12(b)(1) motion may raise a "facial" or a "factual" challenge to the Court's jurisdiction. *See Hale v. United States*, Civil Action No. 13-cv-1390 (RDM), 2015 WL 7760161, at *3–4 (D.D.C. Dec. 2, 2015). A facial challenge to the Court's jurisdiction contests the legal sufficiency of the jurisdictional allegations contained in the complaint. *See Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006). For a facial challenge, the Court must accept the allegations of the complaint as true and must construe "the factual allegations in the

complaint in the light most favorable to the non-moving party." *Id.*; *see also I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d at 1184, 1188 (D.C. Cir. 2003). In this sense, the Court must resolve the motion in a manner similar to a motion to dismiss under Rule 12(b)(6). *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

Alternatively, a Rule 12(b)(1) motion may pose a "factual" challenge to the Court's jurisdiction. *Erby*, 424 F. Supp. 2d at 182–83. For factual challenges, the Court "'may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant,' but 'must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss.'" *Id.* (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)). In this context, the factual allegations of the complaint are not entitled to a presumption of validity, and the Court is required to resolve factual disputes between the parties. *Id.* at 183. The Court may consider the complaint, any undisputed facts, and "'the [C]ourt's resolution of disputed facts.'" *Id.* (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

A motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In evaluating a Rule 12(b)(6) motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim to relief,' and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. Dist. of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)) (alterations in original) (internal citation omitted). The complaint, however, need not include "detailed factual allegations" to withstand a Rule 12(b)(6) motion. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A

plaintiff may survive a Rule 12(b)(6) motion even if "recovery is . . . unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level." *Id.* at 555–56 (internal quotation marks omitted).  In assessing a Rule 12(b)(6) motion, a court may consider only "the facts contained within the four corners of the complaint," *Nat'l Postal Prof'l Nurses v. U.S.P.S.*, 461 F. Supp. 2d 24, 28 (D.D.C. 2006), along with "any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record," *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011).

### III.  DISCUSSION

The federal Defendants move to dismiss on several grounds.  They argue that the Court lacks jurisdiction over Plaintiff's claims against CSOSA because the FTCA bars claims against federal agencies, Dkt. 13-1 at 7, and they further argue that the Court lacks jurisdiction over Plaintiff's claims against the United States because of the "independent contractor" exception to the FTCA, *id.* at 7–11.  On the merits, the federal Defendants assert that they had no duty of care to Dana Hamilton, because the murder was unforeseeable, *id.* at 11–14, and that the public duty doctrine shields them from liability, *id*. at 14–17.  Finally, in their reply brief, the federal Defendants raise an additional defense for the first time—that the intentional tort exception to the FTCA bars Plaintiff's claims.  Dkt. 17 at 5–6.  The Court begins, as it must, with jurisdiction.

**A.    Claims Directly Against CSOSA**

The federal Defendants first argue that Plaintiff cannot sue CSOSA because federal agencies, unlike the United States itself, are not subject to suit under the FTCA.  Dkt. 13-1 at 7. Plaintiff does not respond to this argument.  *See generally* Dkt. 14; *see also* Dkt. 17 at 3 ("Plaintiff did not even attempt to address these arguments in its opposition, thus conceding

dismissal of all counts against CSOSA."). "[W]hen a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003). Plaintiff has thus conceded the federal Defendant's motion with respect to the claims against CSOSA.

But even in the absence of that forfeiture, the claims against CSOSA cannot withstand scrutiny. "The only proper defendant in an action brought under the FTCA is the United States." *Verizon Washington, D.C., Inc. v. United States*, 254 F. Supp. 3d 208, 215 (D.D.C. 2017); *see also Davis v. United States*, 196 F. Supp. 3d 106, 110 n.2 (D.D.C. 2016); *Johnson v. Veterans Affs. Med. Ctr.*, 133 F. Supp. 3d 10, 16 (D.D.C. 2015); *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 81 (D.D.C. 2005). "Even if a federal agency may sue and be sued in its own name, the FTCA bars direct claims against federal agencies." *Verizon Washington*, 254 F. Supp. 3d at 215; *see also* 28 U.S.C. § 2679(a) ("The authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under" the FTCA.).

Here, CSOSA is an independent executive branch agency established by the National Capital Revitalization and Self-Government Improvement Act of 1997. *See* 28 C.F.R. § 800.1. As a federal agency, CSOSA is protected by the sovereign immunity of the United States, and because the FTCA waives sovereign immunity only for suits against the United States itself, the agency remains immune from suit. *See* 28 U.S.C. § 2679(a); *Verizon Washington*, 254 F. Supp. 3d at 215; *see also Kline v. Republic of El Salvador*, 603 F. Supp. 1313, 1317 (D.D.C. 1985) ("[T]he Act directs that the exclusive remedy for common law tort claims is an action against the United States rather than against the individuals or the particular government

agencies . . . ."). All five of Plaintiff's claims against CSOSA must therefore be dismissed for lack of jurisdiction.

**B.      Independent Contractor Exception**

The federal Defendants next argue that Plaintiff's claims against the United States are barred by the independent contractor exception to the FTCA. Dkt. 13-1 at 7–11. The FTCA waives sovereign immunity for suits against the United States based on the tortious acts of "officers or employees of any federal agency . . . and persons acting on behalf of a federal agency in an official capacity." 28 U.S.C § 2671. The FTCA defines "federal agency," in turn, as "the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, *but does not include any contractor with the United States*." *Id.* (emphasis added). "Since the United States can be sued only to the extent that it has waived its immunity, due regard must be given to the exceptions, including the independent contractor exception, to such waiver." *United States v. Orleans*, 425 U.S. 807, 814 (1976). Following the Supreme Court's decision in *Orleans*, "courts 'routinely hold that the United States cannot be sued where the alleged duty of care has been delegated to an independent contractor.'" *Verizon Washington*, 254 F. Supp. 3d at 216 (quoting *Hsieh v. Consul. Eng'g Servs., Inc.*, 569 F. Supp. 2d 159, 176 (D.D.C. 2008)).

To determine whether the independent contractor exception applies, courts look to the level of control that the United States exerts over the contractor. As the Supreme Court explained in *Orleans*, "[a] critical element in distinguishing an agency from a contractor is the power of the Federal Government to control the detailed physical performance of the contractor." *Orleans*, 425 U.S. at 814 (internal quotation marks and citation omitted). And as the D.C.

Circuit has further explained, "a contractor's negligence may only be imputed to the United States if the contractor's 'day-to-day operations are supervised by the Federal Government.'" *Macharia v. United States*, 334 F.3d 61, 68 (D.C. Cir. 2003) (quoting *Orleans*, 425 U.S. at 815).

So long as the federal government does not supervise those day-to-day activities, it may assert substantial control over the contractor without vitiating the independent contractor exception to the FTCA. Under D.C. Circuit precedent, "the government may 'fix specific and precise conditions to implement federal objectives' without becoming liable for an independent contractor's negligence." *Macharia*, 334 F.3d at 68–69 (quoting *Orleans*, 425 U.S. at 816). In sum, "[i]f the contractor manages the daily functioning of the job, with the federal actor just exercising broad supervisory powers, the contractor is likely an independent contractor." *Hsieh*, 569 F. Supp. 2d at 176–77.

Because the federal Defendants mount a factual challenge to the Court's jurisdiction, the Court "may consider the complaint supplemented by undisputed facts evidenced in the record." *Herbert*, 974 F.2d at 197. Here, the federal Defendants rely on the contract with Sentinel, Dkt. 17-2, and a supporting declaration, Dkt. 17-1. The parties each base their arguments on the contract terms, and Plaintiff does not dispute the authenticity of the document. Courts in this circuit, moreover, routinely analyze government contracts in considering factual challenges to their jurisdiction based on the FTCA's independent contractor exception. *See, e.g.*, *Macharia*, 334 F.3d at 68–69; *Verizon Washington*, 254 F. Supp. 3d at 211 n.4; *Phillips v. Fed. Bureau of Prisons*, 271 F. Supp. 2d 97, 101 (D.D.C. 2003). The Court will thus look to the contract with Sentinel to determine whether the independent contractor exception applies in this case.

The contract, which is between Sentinel and a CSOSA component-agency known as the Pretrial Services Agency ("PSA"), was in effect from September 26, 2013 through September

25, 2018. Dkt. 17-2 at 5 (Ex. A ¶ B.5). In its "Purpose and Objective" section, the contract tasked Sentinel with "continuous real-time monitoring and communication with defendants while they are . . . traveling outside of the residence, under curfew, home confinement, or being supervised in accordance with *orders to stay away from specified geographic locations or persons*." *Id.* at 14 (Ex. A ¶ D.1) (emphasis added). The contract gave Sentinel broad responsibility for "providing all equipment, monitoring services, *installation services*, de-installation services, equipment maintenance[,] and user training for the system(s) that electronically monitors a defendant's curfew or stay away order." *Id.* at 19 (Ex. A ¶ D.2.3) (emphasis added). And Sentinel was "solely responsible for rectifying any and all issues resulting in failures and deficiencies from equipment or services provided to PSA." *Id.* Notably, the contract expressly provided that PSA would not "exercise any supervision or control over [Sentinel] in its performance of contractual services . . . ." *Id.* at 9 (Ex. A ¶ PSA 05(e)). These general provisions are consistent with the federal Defendants' position that Sentinel was an independent contractor. PSA broadly delegated to Sentinel the task of monitoring defendants subject to stay away orders.

To be sure, the contract provided detailed instructions for the installation of "[n]on-removable [m]onitoring [d]evice(s)." *Id.* at 20 (Ex. A ¶ D.2.4). Devices were to be "adjustable to ensure a secure but comfortable fit on the wrist or ankle of any defendant." *Id*. Further, Sentinel was to employ devices that were "tamper resistant and have features that reliably detect efforts to tamper with, or remove, the device." *Id*. The contract's list of requirements for the GPS tracking units went on at length—they were to be durable but not present a safety hazard, definitely shock resistant, and preferably submersible, with a signal range configurable from zero to 150 feet in the home and an internal power source capable of functioning for at least six

months.  *Id*.  The contract also gave specific directives with respect to stay away orders.  Sentinel was to "track the defendant's location 24 hours per day."  *Id.* at 15 (Ex. A ¶ D.2.1.2)  "When a defendant enters a geographical area of exclusion, [Sentinel's] system will warn and instruct the defendant to leave the vicinity as well as notify the PSA case manager as the event occurs, noting within [Sentinel]'s system the actual time the defendant enters a geographical area of exclusion."  *Id*.

Although these provisions dictated how Sentinel was to perform its contractual duties, they are nonetheless consistent with the federal Defendants' contention that Sentinel acted as an independent contractor for purposes of the FTCA exception.  As the D.C. Circuit has held, "the government may fix specific and precise conditions to implement federal objectives without becoming liable for an independent contractor's negligence."  *Macharia*, 334 F.3d at 68–69 (internal quotation marks and citation omitted).  Here, the contract gave Sentinel specific and precise instructions at the outset for how to affix GPS ankle monitors, but the contract did not contemplate that PSA would supervise Sentinel's day-to-day implementation of these instructions.

Plaintiff points to other portions of the contract, including those pertaining to employment policies and automated systems, in support of his argument that PSA "supervises Sentinel's day-to-day operations and maintains significant control over Sentinel's physical performance."  Dkt. 14 at 7.  The contract gave PSA oversight of some Sentinel personnel decisions.  For example, Sentinel could "not of its own remove or replace any personnel designated as 'key' personnel without the written concurrence of the cognizant Contracting Officer."  Dkt. 17-2 at 8 (Ex. A ¶ PSA 05(b)).  The contract made Sentinel "accountable to the Government for the action of its personnel," *id.* at 9 (Ex. A ¶ PSA 05(e)), and stated that

"employee recruiting and retention practices [would] be monitored on a regular basis," *id.* (Ex. A ¶ PSA 05(f). And Sentinel's "staff representatives" worked in PSA's building. *Id.* at 16 (Ex. A ¶ D.2.1.6).

But when read as a whole, the contract made clear that Sentinel bore primary responsibility for its own personnel decisions: It required Sentinel to "select, supervise, and exercise control and direction over its employees" and, significantly, included a disclaimer that "[t]he Government shall not exercise any supervision or control over [Sentinel] in its performance of contractual services." *Id.* (Ex. A ¶ PSA 05(e)). The contract also included a "Non-Personal Services" provision that emphasized that "[n]o [Sentinel] employee will be directly supervised by the Government" and "[a]ll individual employee assignments, and daily work direction, shall be given by the applicable employee supervisor." *Id.* at 13 (Ex. A ¶ PSA 19(a)). In a declaration attached to the federal Defendants' reply brief, PSA Supervisory Contracting Officer Jeffery Brakebill further clarifies that, even though "PSA provided work space for on-site Sentinel employees," Sentinel was "responsible for hiring, supervising, and exercising routine and daily control over all their employees, including those located at PSA on-site locations." Dkt. 17-1 at 3 (Brakebill Decl. ¶¶ 7–8). Although PSA retained some power to oversee Sentinel's personnel decisions, these provisions do not demonstrate that Sentinel's "day-to-day operations [were] supervised by the Federal Government." *Macharia*, 334 F.3d at 68 (internal quotation marks and citations omitted). Rather, Sentinel "manage[d] the daily functioning of the job" of electronically monitoring defendants, including the task of attaching GPS tracking devices to their bodies, "with the federal actor just exercising broad supervisory powers" over personnel matters. *Hsieh*, 569 F. Supp. 2d at 176–77.

13

Plaintiff makes a more substantial argument with respect to the ways in which the contract required Sentinel to loop PSA into its automated online systems. Dkt. 14 at 7–8. Because "[s]haring information is part of [PSA's] mission," the contract required Sentinel to "provide secure means for raw data exchange between their system and PSA." Dkt. 17-2 at 16 (Ex. A ¶ D2.1.5). Sentinel was required to "provide a secure web service . . . to exchange data with [PSA] in real or near-real time." *Id*. And Sentinel's "automated remote system" was required "to support a minimum of 30 concurrent PSA staff members." *Id.* at 17 (Ex. A ¶ D2.2.2.2). Likewise, the contract mandated that Sentinel "provide PSA with a web-enabled interface for notifying" Sentinel when "monitoring devices" needed to be retrieved. *Id.* at 19 (Ex. A ¶ D.2.3). Further, Sentinel was to "provide[] PSA with real-time remote web-based access to its monitoring system to view, print, download, and enter/modify defendant monitoring information." *Id.* at 20–21 (Ex. A ¶ D.2.8).

Although one might contend that these provisions created a system for digital supervision of Sentinel's work, they are better construed to have simply (1) facilitated communication between Sentinel and PSA and (2) delineated the scope of the authorities that PSA was delegating to Sentinel and those that it was retaining, including its responsibility to "report[] to the court any failure to comply with pretrial release conditions." *Id.* at 16 (Ex. A ¶ D.2.1.5). In any event, whatever level of supervision PSA might have exercised over Sentinel's monitoring systems, there is no indication that PSA supervised Sentinel's installation of monitoring devices on defendants, which is the allegedly negligent action at issue here.

In *Verizon Washington*, this Court considered similar contractual provisions and held that the independent contractor exception applied. 254 F. Supp. 3d at 217. That case involved a Government Services Agency ("GSA") contract for maintenance and operations of an

14

underground steam distribution system. *Id.* at 211–13.  The Court noted that the contract in question called for "close coordination" between GSA and the contractor. *Id.* at 217.  For instance, the contractor was to coordinate with GSA on "prioritization of maintenance and repair work," and GSA was empowered to inspect the contractor's work for compliance. *Id.*  To facilitate communication between the contractor and the government, GSA "provide[d] radios to all employees" of the contractor. *Id.*  The Court concluded that this level of coordination did not constitute supervision of day-to-day activities but, rather, showed that GSA had delegated responsibility for routine repairs while retaining authority over setting priorities and conducting inspections. *Id.* at 217–18.  Here, the contract provisions that required Sentinel to grant PSA access to its online systems facilitated communication and coordination, but they did not provide for day-to-day supervision of Sentinel's performance of the tasks that were assigned to it, including the task of attaching GPS monitors to defendants.

The Court, accordingly, concludes that the independent contractor exception to the FTCA bars claims against the United States arising from Sentinel's negligence in performing duties assigned to it under the contract.  Because the Court does not have jurisdiction to adjudicate these claims against the United States, it need not consider the federal Defendants' alternative contention that the intentional-tort exception to the FTCA applies in this case and may not proceed to the merits question of whether federal Defendants owed any duty to Dana Hamilton.

**C.     Claims Arising from Federal Defendant's Own Negligence**

In his opposition to the motion to dismiss, Plaintiff asserts that the United States was negligent for hiring Sentinel in the first place, a claim that would not be subject to the FTCA's independent contractor exception.  Dkt. 14 at 9.  Plaintiff argues that "[a] separate action may be maintained against [the United States] for the negligent hiring of Defendant Sentinel to perform

monitoring services for criminal defendants in the District" and that "[s]uch cause of action exists separate and apart from the contractual agreement between PSA and Sentinel." *Id*. In support of this argument, Plaintiff attaches to his opposition brief a pair of news articles about alleged wrongdoing by Sentinel in California and Florida. Dkt. 14-1 at 9–13 (Ex. B).

Plaintiff is correct that the independent contractor exception to the FTCA would not bar a claim based on the government's own negligence, but this argument suffers from a different problem—the complaint makes no mention of this separate cause of action and does not allege any facts to support it. "[A] complaint may not be amended by the briefs in opposition to a motion to dismiss." *Friends of Animals v. Ashe*, 51 F. Supp. 3d 77, 85 n.2 (D.D.C. 2014), *aff'd*, 808 F.3d 900 (D.C. Cir. 2015) (internal quotation marks and citation omitted). If Plaintiff has a good-faith basis to amend his complaint to allege that the United States was negligent for hiring Sentinel given known concerns about the company's competence, he may file a motion seeking leave to amend his complaint within twenty-one days of this decision.

## CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** the federal Defendants' motion to dismiss, Dkt. 11. Plaintiff may file a motion seeking leave to amend his complaint, as discussed above, within twenty-one days of this decision. If he fails to do so, the Court will enter final judgment with respect to the federal Defendants at that time.

**SO ORDERED**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: November 16, 2020